# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **WALTER BARNES,** | ) | **CASE NO. 8:07CV348** |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM AND ORDER** |
| v. | ) | **ON MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| **RITE STYLE OPTICAL COMPANY,** | ) | |
| Defendant. | ) | |

This matter is before the Court on the Motion for Summary Judgment (Filing No. 29) filed by Defendant Rite Style Optical Company ("Rite Style"). For the reasons stated below, the motion will be granted.

## PROCEDURAL AND FACTUAL BACKGROUND

On September 14, 2006, Plaintiff Walter Barnes filed a claim of race discrimination against Rite Style with the Omaha Human Rights and Relations Department. On March 30, 2006, he amended the charge to include discrimination based on perceived disability. On June 19, 2007, Barnes received a right-to-sue letter from the Equal Employment Opportunity Commission. He filed this action on September 5, 2007, bringing claims against Rite Style for alleged violations of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; and the Civil Rights Act of 1870, 42 U.S.C. § 1981.

The parties' briefs (Filing Nos. 30, 38, and 40) and evidentiary submissions (Filing Nos. 33, 39, and 41) demonstrate that material facts are not in dispute. In summarizing the facts, below, the Court has construed the facts in a light most favorable to Barnes.

Rite Style is a Nebraska corporation specializing in the manufacture of prescription eye-wear. Barnes is an African-American male who was hired by Rite Style on September 3, 1982, as a lab technician. Barnes worked at Rite Style's Omaha location for nearly 24 years, with scheduled work hours of 7:30 a.m. to 4:30 p.m.

On December 1, 2000, Barnes received an employee handbook that emphasized the responsibility of Rite Style employees to call their supervisors at or before the start of a work shift if unable to work. The handbook provided that late arrivals for work or absences from work would be considered "excused" only if the employee called in advance and the late arrival or absence was for a compelling reason. The handbook warned that an employee's unexcused tardiness or absence was a serious matter and that a consistent pattern of late arrival or absence could lead to disciplinary action including termination. Barnes understood Rite Style's policy.

In the fall of 2005, Rite Style changed its payday from Friday to Thursday. On October 12, 2005, Barnes suffered a stroke and was absent from work for approximately six weeks. He returned to work on December 2, 2005, with a physician's release. When Barnes's physician requested that certain restrictions be placed on his work activities, Rite Style made accommodations in Barnes's work requirements so that all such restrictions were met. After January 15, 2006, Barnes had no further medical restrictions on his work activities.

Between December 2, 2005, and June 23, 2006, Barnes was late or absent from work on ten separate occasions, each falling on a Friday.[1] On June 16, 2006, Barnes's supervisor, Butch Clark, gave Barnes a written "Performance Coaching Review," advising

---

[1] Barnes contends that he was late for work on four occasions due to doctor's appointments; he was late and "excused" two other times; he was absent and "excused" two times due to illness; and he was sent home by management on one occasion even though he felt able to work. He claims that he complied with company policy by calling in to let Rite Style know that would be late or absent, except on June 23, 2006, when he "could not move for a couple hours." Affidavit of Walter Barnes ("Barnes Aff."), Filing No. 39-4, p.12-13, ¶¶ 4, 6, 7, 10.

2

him that he had been late or absent on several Fridays, including June 9, 2006, and that another such occurrence could result in his termination. Barnes was absent the next Friday, June 23, 2006, and did not call Rite Style at or before the beginning of the work day. Rite Style terminated Barnes from its employment that day.

At some time before his termination, Barnes spoke to a co-worker, Rich Velasquez, who was the "lead" employee in the department where Barnes worked. Barnes said that he was exhausted on Fridays because he was going to a casino on Thursday nights. Velasquez shared this information with Clark, who told Barnes that he believed Barnes's late arrivals and absenteeism were due to Barnes spending Thursday nights at a casino. Although Barnes now denies that he has been to a casino in the last eight years, he does not deny making the statement to Velasquez.[2]

---

[2]In his affidavit in opposition to the Motion for Summary Judgment, Barnes acknowledges telling his co-worker that he had been to a casino on one Thursday night; he acknowledges that the co-worker told Clark that Barnes had gone to a casino; and he alleges that he himself told Clark he had not gone to a casino. Barnes Aff. ¶ 12. Barnes's deposition testimony differs:
> Q. Isn't it true that you told Rich Velasquez that you were exhausted on Fridays because you were going to the casino on Thursday nights?
> A. Yes, I told him that, but that wasn't true.
> Q. You told Rich Velasquez that you were going to the casino on Thursday nights; is that right?
> A. I told him that, but –
> Q. That's my –
> A. -- but that's not true. I told him, but it's not true.
> . . . .
> Q. Did you ever tell Mr. Velasquez that you had lied to him when you told him that you were going to the casinos every night, every Thursday night? [objection]
> A. I told Mr. Velasquez that I went, but it was a lie.
> Q. Did you ever tell him it was a lie?
> A. No. Never talked to him.
> Q. Did you ever tell anyone at Rite-Style that you had told Mr. Velasquez that you were going to the casinos on Thursday nights –

Barnes does not dispute that he was late to work or absent from work on ten Fridays from December 2, 2005, to June 23, 2006. He contends, however, that his late arrivals and absences were all for compelling reasons, such as doctor's appointments or illness, and were "excused" by Rite Style, with the exception of his last absence on June 23, 2006, when he was physically unable to call Rite Style before or at the start of the work day. He disputes Rite Style's assertion that he received verbal warnings for his lateness on April 28, 2006, and June 9, 2006. He also disputes any inference that the written warning he received from Clark on June 16, 2006, was his second written warning for lateness or absence.[3]

Barnes contends that Velasquez and Clark perceived Barnes to be disabled, because he had a limp and appeared fatigued, although he was able to perform his job functions and complete all tasks assigned to him. Barnes alleges that other Rite Style employees who were white and who were not perceived to be disabled were given favorable treatment in that their employment was not terminated despite having attendance records worse than his own. Most notably, Barnes has submitted evidence of the attendance records of Rite Style employees K.C. and C.P. This evidence indicates that,

---

A. No.
Q. – but in fact you were not?
A. No, just Mr. Velasquez.
Q. As far as you know, Mr. Velasquez didn't have any reason to believe that you were not telling him the truth when you told him you were going to the casinos on Thursday nights?
[objection]
A. I guess not.

Deposition of Walter Barnes, Filing No. 33-6, pp. 5 & 11, 80:6-18, 103:7 to 104:3.

[3] Barnes does acknowledge receiving an unrelated written warning from Rite Style in August 2000.

in 2005, K.C. had 15 days of unexcused absences in nine months, with a resulting written warning prescribing the consequence: "Try to miss No Day's 90 Day?"[4] The evidence also indicates that C.P. had twenty "no shows" and three "days late" from January 2004 to January 2005, before he began to receive written warnings for his unexcused absences on March 20, 2006, and April 5, 2006.[5]

K.C. worked in Rite Style's Lincoln office and did not have the same supervisor as Barnes. C.P. worked in Rite Style's Lincoln office before 2006, but worked in the Omaha office under Clark's supervision in 2006. Barnes claims that C.P. had "at least seven or eight 'no call, no shows' during the first six months of 2006."[6] Valasquez recalls C.P. being absent from work without calling at least four or five times while C.P. worked in the Omaha office.[7] Clark, who supervised both Barnes and C.P. at the Omaha office in 2006, gave C.P. a written warning on March 20, 2006, for being absent and failing to give advance notice to Rite Style. The written warning noted that it was C.P.'s second offense. Clark initially took no action on C.P.'s first offense, because Clark believed that C.P. was still assigned to the Lincoln office. Clark gave C.P. a second written warning on April 5, 2006. When C.P. failed to appear for work on July 14, 2006, his employment was terminated.[8]

---

[4] Filing No. 39-4, pp. 1,2, and 7.

[5] Filing No. 39-4, pp. 4-8.

[6] Barnes Aff. ¶ 15.

[7] Deposition of Rich Velasquez, Filing No. 39-2, p. 16, 7:7 - 8:15.

[8] Deposition of Butch Clark, Filing No. 33-8, pp. 2-3, 47:19 to 51:12.

**STANDARD OF REVIEW**

In the context of a summary judgment motion, the Court's function is to consider the evidence and determine whether the moving party is entitled to judgment as a matter of law. The proponent of a motion for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (quoting Fed. R. Civ. P. 56(e)). A "genuine" issue of material fact is more than "some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586.

In considering a motion for summary judgment, a court views the facts in the light most favorable to the nonmoving party, and gives that party the benefit of all reasonable inferences. *McNary v. Schreiber Foods, Inc.*, 535 F.3d 765, 768 (8th Cir. 2008) (Americans with Disabilities Act); *Fields v. Shelter Mut. Ins. Co.*, 520 F.3d 859, 863 (8th Cir. 2008) (Title VII and 42 U.S.C. § 1981).

**ANALYSIS**

*Americans with Disabilities Act*

The Americans with Disabilities Act ("ADA") provides: "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such

individual in regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "covered entity" includes an "employer." 42 U.S.C. § 12111(2). "Disability" with respect to an individual means "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).

> ADA . . . claims are analyzed under the well-known *McDonnell Douglas* burden shifting analysis. The employee bears the initial burden of proving a prima facie case of discrimination. The employer then has the burden to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Finally, to prevail, plaintiff must show that the defendant's proffered reason was a pretext for discrimination.

*Dovenmuehler v. St. Cloud Hosp.*, 509 F.3d 435, 439 (8th Cir. 2007) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)) (internal citations omitted).

To establish a prima facie case of disability discrimination, a plaintiff must show: (1) that he was disabled within the meaning of the ADA; (2) that he was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) that he suffered an adverse employment action due to his disability. *Chalfant v. Titan Dist., Inc.,* 475 F.3d 982, 988 (8th Cir. 2007) (citing *Wenzel v. Missouri-Am. Water Co.*, 404 F.3d 1038, 1040 (8th Cir. 2005)).

Barnes does not contend that he had a physical or mental impairment that substantially limited one or more of his major life activities. Instead, he contends that Rite Style *regarded* him as having such an impairment and that Rite Style's perception of him as having a disability was a motivating factor in its decision to terminate his employment.

7

"A person is regarded as disabled if '(1) the employer mistakenly believes that the employee has an impairment (which would substantially limit one or more major life activity), or (2) the employer mistakenly believes that an *actual* impairment substantially limits one or more major life activity.'" *Chalfant,* 475 F.3d at 988-89 (quoting *Wenzel,* 404 F.3d at 1040) (emphasis in original).  "Major life activities are activities such as 'caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" *Chalfant,* 475 F.3d at 989 (quoting *Conant v. City of Hibbing*, 271 F.3d 782, 784 (8th Cir. 2001)).

Barnes states that when he returned to work after his stroke he walked with a limp, was tired, and processed information more slowly than he had before his stroke, which symptoms all were more pronounced toward the end of the work week.  Barnes alleges that Clark and Velasquez made numerous comments about his limp, balance and fatigued appearance, and that Clark told Barnes that his limping and manner of walking were "not acceptable."  (Barnes Aff. ¶ 8).  Yet, Barnes also contends that he "was at all times after his stroke able to perform the functions of his job *to the satisfaction of Rite Style* and completed all tasks assigned to him."  (Plaintiff's Brief, Filing No. 38, p. 6, ¶ 7, emphasis added).

Construing the facts in a light most favorable to Barnes, as the Court must at this stage of the proceedings, Barnes has presented a prima facie case of discrimination based on disability under the ADA.  He has presented evidence from which a reasonable jury could conclude that his supervisors at Rite Style mistakenly believed that his stroke substantially limited his ability to walk.  Barnes has also presented sufficient evidence from which a reasonable jury could conclude that he was qualified to perform the essential

functions of his job, with or without reasonable accommodation, and that he suffered an adverse employment action, *i.e.*, termination.

The burden, therefore, shifts to Rite Style to articulate a legitimate nondiscriminatory reason for the adverse employment action. Rite Style has produced evidence that Barnes was terminated due to his poor attendance. Barnes was late or absent on nine Fridays in a six month period; he received a written warning that another such absence could result in termination; he was absent on the following Friday without calling his supervisor at or before the start of the work day; and Rite Style had cause to believe that Barnes was absent on Fridays because he was receiving his paycheck on Thursdays and going to a casino on Thursday nights. Rite Style has, therefore, met its burden of articulating a legitimate nondiscriminatory reason for the adverse employment action.

In response, Barnes has presented evidence that Rite Style employees who were not perceived to be disabled, and who had worse attendance records than his own, were not terminated. Rite Style argues that those employees were not similarly situated to Barnes in every relevant respect. "'Instances of disparate treatment can support a claim of pretext, but [plaintiff] has the burden of proving that he and the disparately treated [employees] were similarly situated in all relevant respects.'" *McNary,* 535 F.3d at 770 (quoting *Sherman v. Runyon*, 235 F.3d 406, 409 (8th Cir. 2000)).

Of the employees whom Barnes alleges were similarly situated to him and received favorable treatment, C.P. is the only one who worked at the same location and under the same supervisor as Barnes. "'"[W]hen different decision-makers are involved, two decisions are rarely similarly situated in all relevant respects."'" *Fields,* 520 F.3d at 864-65 (quoting *Standback v. Best Diversified Prods., Inc.*, 180 F.3d 903, 910 (8th Cir. 1999)). C.P.

worked at the Omaha office and under Clark's supervision during the last six months of his employment, a small fraction of his employment history with Rite Style.[9]

Barnes was fired after Clark determined that Barnes had been late or absent on ten Fridays in a six month period and following one written warning for poor attendance; C.P. was terminated after Clark determined that C.P. had been late or absent on four occasions in a six-to-seven month period and following two written warnings for poor attendance. The only circumstance giving rise to an inference of preferential treatment for C.P. is the one additional written warning he was afforded regarding his poor attendance.[10] We then look to see whether Barnes and C.P. were similarly situated in all relevant respects, so that a reasonable jury could conclude that the disparate treatment was based on an impermissible factor such as Rite Style's perception that Barnes was disabled.

First, Barnes alleged that Rite Style gave C.P. favorable treatment because C.P.'s father worked at the company for at least fifty-five years.[11] Whether or not Barnes's perception was accurate, favorable treatment of an employee based on a relative's employment longevity is not discrimination based on an impermissible factor.[12] Second,

---

[9] C.P. was employed by Rite Style for thirty years. Deposition of Butch Clark, Filing No. 33-8, ("Clark Depo."), p.2, 47:15 to 48:13. Clark testified that Rite Style's attendance rules were applied differently in its Omaha office and its Lincoln office. *Id.* at p.3, 50:4-9; 53:15-16.

[10] It appears that Clark thought the written warning he gave to Barnes was his second written warning, as the document it is described as such. Filing No. 33-15. *See also* Clark Depo., p.3, 52:9-13.

[11] Deposition of Walter Barnes, Filing No. 33-6, pp. 12 & 13, 108:11 -109:10.

[12] Barnes's action alleges disparate treatment, not disparate impact of any employment policy.

10

Clark had good cause to believe that Barnes was abusing the company's attendance policy because he was staying out late on paydays to indulge a penchant for gambling; whereas Clark was aware that C.P. had an "alcohol problem," and a history of absenteeism, but did not necessarily link the two in terms of cause and effect.[13]  Assuming that Rite Style's treatment of C.P. was somehow preferential, Barnes has not met his burden of demonstrating that he and C.P. were similarly situated in all relevant respects, *e.g.*, their supervisor's understanding of the reasons for their respective poor attendance.

### *Title VII and 42 U.S.C. § 1981*

"It shall be an unlawful employment practice for an employer – (1) to . . . discharge any individual, or otherwise to discriminate against any individual with respect to . . . terms, conditions, or privileges of employment, because of such individual's race . . . ."  42 U.S.C. § 2000e-2(a)("Title VII").  "All persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . ."  42 U.S.C. § 1981(a).  "[T]he term 'make and enforce contracts' includes the . . . termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b).  "The rights protected by this section are protected against impairment by nongovernmental discrimination . . . ."  42 U.S.C. § 1981(c).

"An employee may establish unlawful employment discrimination through direct or indirect evidence."  *Bearden v. International Paper Co.*, 529 F.3d 828, 831 (8th Cir. 2008).  Because Barnes has not presented credible direct evidence of race discrimination, the

---

[13] Clark Depo., p.2, 46:2-17.  Other Rite Style managers perceived that at least some of C.P.'s absences were due to his struggle with addiction for which he had been seeking counseling and treatment, encouraged by Rite Style in the hope that C.P. would recover.  Filing No. 39-4, pp. 7,8, and 10.

11

*McDonnell Douglas* framework again applies. *Bearden*, 529 F.3d at 831. Barnes must show that (1) he was a member of a protected group; (2) he was qualified to perform his job; (3) he suffered an adverse employment action; and (4) circumstances permit an inference of discrimination. *Id.* "A prima facie case creates a presumption of unlawful discrimination, shifting the burden of proof to the employer to present evidence of a legitimate, nondiscriminatory reason for its adverse employment action." *Id.* "If the employer can articulate a nondiscriminatory reason, the burden returns to the employee to prove that the proffered reason is pretextual." *Id.* at 831-32 (citing *Brannum v. Missouri Dept. Of Corr.,* 518 F.3d 542, 548 (8th Cir. 2008).

Barnes has established that he was a member of a protected group, *i.e.*, African-American. Construing the evidence in a light most favorable to Barnes, as the Court must do at this stage of the proceedings, he has established that he was qualified to perform his job. He has also established that he suffered an adverse employment action, *i.e.*, termination. With respect to whether the circumstances of his termination permit an inference of discrimination, Barnes's burden at the prima facie stage is "not onerous." *Wheeler v. Aventis Pharm.*, 360 F.3d 853, 857 (8th Cir. 2004) (quoting *Williams v. Ford Motor Co.*, 14 F.3d, 1305, 1308 (8th Cir. 1994)). At the prima facie stage, a plaintiff need only demonstrate that other employees were "'involved in or accused of the same or similar conduct and were disciplined in different ways.'" *Wheeler*, 360 F.3d at 857 (quoting *Williams*, 14 F.3d at 1309); *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 851 (8th Cir. 2005). Considering the low threshold at the prima-facie stage, Barnes has met his burden with respect to each element.

12

Again, the burden shifts to Rite Style to articulate a legitimate, nondiscriminatory reason for the termination, which it has done, and then it is Barnes's burden to demonstrate pretext, which he suggests is shown through evidence that similarly situated white employees received favorable treatment. At this stage, Barnes's burden is "rigorous." *Rodgers,* 417 F.3d at 853. He must demonstrate that the other employees who received different treatment were similarly situated to him in all relevant aspects. *Id.* (citing *Wheeler*, 360 F.3d at 858); *Fields,* 520 F.3d at 864. For the same reasons discussed above in the analysis of the ADA claim, Barnes has not met that burden.

## CONCLUSION

As the Eighth Circuit Court has often said: "'[F]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions.'" *Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 812 (8th Cir. 2005) (quoting *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 973 (8th Cir. 1994)). "[A] number of plaintiffs present a sympathetic situation in which the employer's judgment in imposing discipline may appear poor or erroneous to outsiders. It is tempting to think that the role of the federal courts is to offer a remedy in that sort of case." *Johnson,* 424 F.2d at 812. Whether or not this Court may believe that Rite Style was unduly harsh in its treatment of Barnes, or unduly lenient in its treatment of other employees, the Court's authority is limited to deciding whether there is a genuine issue for trial on the question of whether Rite Style discharged Barnes because of a perceived disability and/or his race. *See id.* Barnes has not met his burden of demonstrating that Rite Style's legitimate, nondiscriminatory reason for his termination was

13

a pretext for discrimination on the basis of perceived disability or race, and no genuine issue of material fact remains for trial.

    IT IS ORDERED:

1. The Defendant Rite Style Optical Co.'s Motion for Summary Judgment (Filing No. 29) is granted;

2. The Complaint (Filing No. 1) and all related claims are dismissed, with prejudice; and

3. A separate Judgment will be entered.

    DATED this 15th day of September, 2008.

                                    BY THE COURT:

                                    s/Laurie Smith Camp
                                    United States District Judge